No. 25-3151

IN THE UNITED STATES COURT OF
APPEALS FOR THE EIGHTH CIRCUIT

UNITED STATES OF AMERICA *APPELLEE*

VS.

CANDACE MILNER *APPELLANT*

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT OF ARKANSAS

Honorable Lee P. Rudofsky
United States District Judge

# APPELLANT'S BRIEF

LISA G. PETERS
FEDERAL DEFENDER

By: Sylvia Talley
Research and Writing Specialist
Federal Defender Office
1401 W. Capitol Ave., Suite 490
Little Rock, AR 72201
(501) 324-6113
Sylvia_Talley@fd.org

## SUMMARY AND REQUEST FOR ORAL ARGUMENT

Following a jury trial, Appellant, Candace Milner, was convicted of being a felon in possession of firearms, in violation of 18 U.S.C. § 922(g)(1), possession of firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A), and possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1).

The district court sentenced Ms. Milner to a total term of 180 months' imprisonment, followed by a total term of 8 years' supervised release.

On appeal, Ms. Milner contends that the evidence is insufficient to support her convictions. She also argues that the district court reversibly erred in admitting evidence. Further, she argues that the government made improper and prejudicial comments during closing arguments.

Ms. Milner requests 15 minutes of oral argument only if this Court deems it necessary to assist in its review.

## TABLE OF CONTENTS

SUMMARY AND REQUEST FOR ORAL ARGUMENT ................................ ii

TABLE OF CONTENTS ........................................................................ iii

TABLE OF AUTHORITIES ..................................................................... v

JURISDICTIONAL STATEMENT .........................................................1

STATEMENT OF THE ISSUES ..............................................................2

STATEMENT OF THE CASE ..................................................................3

SUMMARY OF THE ARGUMENT ......................................................17

ARGUMENT ............................................................................................19

I. The district court should have granted Ms. Milner's motion for judgment of acquittal because the evidence is insufficient to sustain her convictions. ..........................................................................................19

A. Standard of Review ........................................................................19

B. Legal Analysis ...................................................................................20

II. The district court reversibly erred in allowing Officer Hernandez to testify that a confidential informant claimed that Ms. Milner was selling narcotics. ........................................................................................28

A. Standard of Review ........................................................................28

B. Legal Analysis ...................................................................................28

III. The government made improper and prejudicial comments during closing arguments that deprived Ms. Milner of the right to a fair trial. ...32

A. Standard of Review ........................................................................32

B. Legal Analysis ..............................................................................32

CONCLUSION ........................................................................................35

CERTIFICATE OF SERVICE/COMPLIANCE ...............................................36

## TABLE OF AUTHORITIES

**FEDERAL CASES** **PAGE(S)**


*Davis v. Washington*, 547 U.S. 813 (2006) .................................................... 28-29

*Michigan v. Bryant*, 562 U.S. 344 (2011) ........................................................... 28

*United States v. Aponte*, 619 F.3d 799 (8th Cir. 2010) ....................................... 19

*United States v. Arias*, 74 F.4th 544 (8th Cir. 2023) .......................................... 28

*United States v. Brown*, 3 F.3d 673 (3d Cir. 1993) ........................................ 2, 25

*United States v. Burning Breast*, 8 F.4th 808 (8th Cir. 2021) ............................ 20

*United States v. Dooley*, 580 F.3d 682 (8th Cir. 2009) ....................................... 23

*United States v. Foster*, No. 23-1372,
2024 WL 3064940 (8th Cir. June 20, 2024) ...................................................... 19

*United States v. Holmes*, 413 F.3d 770 (8th Cir. 2005) ................ 2, 32, 33-34, 34

*United States v. Holmes*, 620 F.3d 836 (8th Cir. 2010) ............................... *passim*

*United States v. Jenkins*, 90 F.3d 814 (3d Cir. 1996) ..................................... 2, 27

*United States v. Johnson*, 968 F.2d 768 (8th Cir. 1992) ..................................... 33

*United States v. Kelton*, 446 F.2d 669 (8th Cir. 1971) ....................................... 19

*United States v. Miller*, 621 F.3d 723 (8th Cir. 2010) .................................... 2, 34

*United States v. Parker*, 871 F.3d 590 (8th Cir. 2017) ....................................... 19

*United States v. Ramos*, 852 F.3d 747 (8th Cir. 2017) ................................ *passim*

*United States v. Reeves*, 143 F.4th 999 (8th Cir. 2025) ................................ 26, 27

*United States v. Soto*, 716 F.2d 989 (2d Cir. 1983) .................................. 2, 25-26

*United States v. True*, 179 F.3d 1087 (8th Cir. 1999) ........................................ 32

*United States v. Valadez-Gallegos*, 162 F.3d 1256 (10th Cir. 1998) .................. 22

*United States v. Ways*, 832 F.3d 887 (8th Cir. 2016) .......................................... 21

**FEDERAL STATUTES**

18 U.S.C. § 922 ............................................................................................ *passim*

18 U.S.C. § 924 ............................................................................................1, 3, 26

18 U.S.C. § 3231 ............................................................................................... 1

21 U.S.C. § 841 ............................................................................................1, 24

21 U.S.C. § 851 ............................................................................................... 4

28 U.S.C. § 1291 ............................................................................................... 1

**FEDERAL RULE(S)**

Fed. R. App. P. 4 ............................................................................................ 1

## JURISDICTIONAL STATEMENT

This is an appeal from a final judgment in a criminal case from the United States District Court, Eastern District of Arkansas, in which the Appellant, Candace Milner, was convicted of being a felon in possession of firearms, in violation of 18 U.S.C. § 922(g)(1), possession of firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A), and possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1). Because Ms. Milner was charged with violating provisions of the United States Code, the district court had jurisdiction pursuant to 18 U.S.C. § 3231.

The United States Court of Appeals for the Eighth Circuit has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, which provides for jurisdiction over all final decisions of the district courts of the United States.

The final judgment was entered on October 28, 2025. Pursuant to Federal Rule of Appellate Procedure 4(b)(1), a timely notice of appeal was filed on October 28, 2025.

## STATEMENT OF THE ISSUES

I. The district court should have granted Ms. Milner's motion for judgment of acquittal because the evidence was insufficient to sustain her convictions.

*United States v. Brown*, 3 F.3d 673 (3d Cir. 1993)

*United States v. Jenkins*, 90 F.3d 814 (3d Cir. 1996)

*United States v. Ramos*, 852 F.3d 747 (8th Cir. 2017)

*United States v. Soto*, 716 F.2d 989 (2d Cir. 1983)

II. The district court reversibly erred in allowing Officer Hernandez to testify that a confidential informant claimed that Ms. Milner was selling narcotics.

*United States v. Holmes*, 620 F.3d 836 (8th Cir. 2010)

III. The government made improper and prejudicial comments during closing arguments that deprived Ms. Milner of the right to a fair trial.

*United States v. Holmes*, 413 F.3d 770 (8th Cir. 2005)

*United States v. Miller*, 621 F.3d 723 (8th Cir. 2010)

## STATEMENT OF THE CASE

### I. Procedural History

This case arose after the Little Rock Police Department (LRPD) allegedly received information from a confidential source that Candace Milner was possibly selling narcotics in the Little Rock area. (T. TR., Vol. 2, p. 533). Sometime later, LRPD Officer Zachary Nelson conducted a traffic stop of Ms. Milner on August 16, 2023. (T. TR., Vol. 2, p. 332).

During the traffic stop, Ms. Milner handed methamphetamine and marijuana to Officer Nelson. (T. TR., Vol. 2, pp. 337-338). Ms. Milner also consented to a search of her home, which resulted in the discovery of methamphetamine and firearms. (T. TR., Vol. 2, pp. 341, 352, and 409-410)

Subsequently, the government filed an indictment against Ms. Milner—charging her in Count One with being a felon in possession of one or more firearms, in violation of 18 U.S.C. § 922(g)(1); in Count Two with possession of one or more firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A); and in Count Three with possession with intent to distribute 50 grams or more, but less than 500 grams, of a mixture and substance containing a detectable amount of

methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). (R. Doc. 1, at pp. 1-2).

Ms. Milner pleaded not guilty to the charges and proceeded to a jury trial before the Honorable Lee P. Rudofsky. (R. Docs. 5 and 40-43).

Prior to trial, the government filed an Information Seeking Enhanced Statutory Penalty Pursuant to 21 U.S.C. § 851, which would increase the statutory penalty range for Count Three from 5-40 years' imprisonment to 10 years-life imprisonment. (R. Doc. 21).

Following the jury trial, Ms. Milner was convicted on all three counts. (R. Doc. 49). The jury also found that Ms. Milner served more than 12 months' imprisonment for prior offenses for possession of methamphetamine and cocaine with purpose to deliver and that she was released from serving that term of imprisonment within 15 years of the commencement of the offense charged in Count Three. (R. Doc. 51).

On October 27, 2025, the district court sentenced Ms. Milner to a total term of 180 months' imprisonment, followed by a total term of 8 years' supervised release. (R. Doc. 59, at pp. 3 and 4).

## II. Trial

On May 19, 2025, Ms. Milner's jury trial commenced. (R. Doc. 40).

During Ms. Milner's trial and over her objections,[1] LRPD Officer Christoval Hernandez testified that he began investigating Ms. Milner in August of 2023 after he received information from a source that Ms. Milner was selling narcotics in the Little Rock area. (T. TR., Vol. 2, pp. 532-533).

After allegedly receiving that information, Officer Hernandez located Ms. Milner's address and started conducting surveillance. (T. TR., Vol. 2, pp. 533-534).

On August 16, 2023, Officer Hernandez and LRPD Detective Dalton Schisler began surveilling Ms. Milner's residence around 9 or 10 in the

---

[1] Prior to Officer Hernandez's testimony, the government informed the district court that it believed Officer Hernandez's anticipated testimony regarding receiving a tip from a confidential source that Ms. Milner was selling narcotics was not hearsay because such testimony was being offered to explain the propriety of the investigation. (T. TR., Vol. 2, pp. 487-504). Ms. Milner objected to the anticipated testimony because the propriety of the investigation was not being challenged, the reliability of the tipster could not be established, and admission of such testimony would violate the confrontation clause. (T. TR., Vol. 2, pp. 504-507). The district court ruled that the government could elicit testimony that the investigation started because of a tip that Ms. Milner was selling narcotics. (T. TR., Vol. 2, p. 507). The district court also informed the parties that it would give the jury a limiting instruction regarding the testimony. (T. TR., Vol. 2, pp. 507-508). The district court also noted that defense had a continuing objection regarding the testimony. (T. TR., Vol. 2, p. 531).

morning. (T. TR., Vol. 2, pp. 398 and 535). During their surveillance,[2] they did not witness any traffic going in and out her house that would be consistent with drug trafficking. (T. TR., Vol. 2, pp. 397, 398, 550, and 561). So, around 11 or 12, Detective Schisler purportedly contacted a cooperating individual that knew Ms. Milner to order narcotics. (T. TR., Vol. 2, pp. 398, 402, 511, and 536).

Sometime later, Ms. Milner and two Hispanic men exited her house, got into her vehicle, and drove away. (T. TR., Vol. 2, pp. 402, and 537). Officer Hernandez and Detective Schisler followed them and contacted LRPD Officer Zachary Nelson and instructed him to conduct a traffic stop of Ms. Milner's vehicle. (T. TR., Vol. 2, p. 537).

As instructed, Officer Nelson conducted a traffic stop of Ms. Milner's vehicle, which had a broken taillight and the insurance was unconfirmed. (T. TR., Vol. 2, p. 336). Officer Nelson informed Ms. Milner the reasons for the stop and asked for her driver's license, registration, and proof of insurance. (T. TR., Vol. 2, p. 337). Ms. Milner gave Officer Nelson her

[2] Officer Hernandez testified that his investigation of Ms. Milner started five days before August 16, 2023. (T. TR., Vol. 2, p. 534).

registration but told him her driver's license had been stolen the day before. (T. TR., Vol. 2, p. 337).

Officer Nelson then asked Ms. Milner to step of the vehicle. Before stepping out of vehicle, Ms. Milner handed Officer Nelson a yellow baggie that she said was weed (T. TR., Vol. 2, p. 337). And as Ms. Milner was exiting the vehicle, she handed Officer Nelson three clear baggies: one baggie contained a crystalline substance (suspected methamphetamine), another baggie contained a little bit of residue, and the other baggie was empty. (T. TR., Vol. 2, pp. 337-338, 448, and 449).

Thereafter, Officer Nelson arrested Ms. Milner, and LRPD Officer Solis spoke with the two Hispanic men. (T. TR., Vol. 2, p. 339). Officer Nelson also searched Ms. Milner's vehicle and found a "wad of cash" in her purse and a "tad bit" of marijuana in the front passenger door. (T. TR., Vol. 2, pp. 339-340). Ms. Milner told Officer Nelson that the money was for her bills (T. TR., Vol. 2, p. 381).

Detective Schisler and Officer Hernandez also arrived at the scene of the traffic stop and took Ms. Milner to the side to converse with her. (T. TR., Vol. 2, pp. 380 and 403). Ms. Milner told them that there were more narcotics

back at her house and consented to the search of the house. (T. TR., Vol. 2, pp. 382 and 553).

Officer Nelson then transported Ms. Milner to her house. (T. TR., Vol. 2, p. 381). Officer Nelson also testified that the two Hispanic men were transported back to Ms. Milner's house. (T. TR., Vol. 2, p. 386-388). However, Detective Schisler testified that the two Hispanic men were released on scene of the traffic stop and not transported back to Ms. Milner's house. (T. TR., Vol. 2, p. 473).

When they arrived at Ms. Milner's house, law enforcement cleared it while Ms. Milner remained on the porch with Officer Nelson. (T. TR., Vol. 2, pp. 383 and 404). Ms. Milner told Officer Nelson that "they" took her car the night before and that "they" cut her cameras. (T. TR., Vol. 2, pp. 383, 385; T. TR., Vol. 3, p. 691).

After law enforcement cleared the house, Ms. Milner walked Officer Hernandez and Detective Schisler to her bedroom and told them there were narcotics and firearms underneath the mattress. (T. TR., Vol. 2, pp. 410-411 and 538). A glass smoking pipe, digital scale, and sandwich baggies were

also discovered during the search of Ms. Milner's house.[3] (T. TR., Vol. 1, pp. 411 and 424).

Ms. Milner also told law enforcement that narcotics and the firearms were not hers and that they could take them. (T. TR., Vol. 2, pp. 559 and 561; T. TR., Vol. 3, pp. 694-695).

Additionally, Detective Schisler, Officer Hernandez, and Officer Nelson all confirmed that they never saw Ms. Milner sell any drugs or possess any firearms. (T. TR., Vol. 2, pp. 368, 451, and 561).

LRPD submitted the suspected narcotics that were discovered during the traffic stop and home search to the Arkansas State Crime Lab for testing. (T. TR., Vol. 2, p. 539). LRPD, however, did not submit the suspected narcotics, baggies, or firearm for fingerprinting or DNA testing. (T. TR., Vol. 2, pp. 470-471).

Felisia Lackey, chief forensic chemist at the Arkansas State Crime Lab, testified that she was asked to perform testing of items submitted in a case by Rob Bell from the LRPD. (T. TR., Vol. 2, p. 513-514 and 521). In relation

[3] Once the search of Ms. Milner's house was completed, Officer Nelson transported Ms. Milner to the northwest substation at 1001 Kanis Road. (T. TR., Vol. 2, pp. 344 and 421).

to that case, Chief Lackey performed testing on items 737700 and 737698. (T. TR., Vol. 2, p. 521). As to item 737700, Chief Lackey tested three different bags and "determined each bag had methamphetamine in it as well as dimethyl sulfone." (T. TR., Vol. 2, p. 525). Chief Lackey also testified that the net weight of those three bags was 17.6404 grams. (T. TR., Vol. 2, p. 525).

As to item 737698, Chief Lackey determined that it contained methamphetamine and that the net weight of the item was 66.5280 grams. (T. TR., Vol. 2, p. 526).

Ricardo Kennedy, group supervisor with the Drug Enforcement Administration (DEA), testified that methamphetamine is a schedule II controlled substance. (T. TR., Vol. 3, pp. 582 and 586). According to Agent Kenndy, 17 grams of methamphetamine and 84 grams of methamphetamine are both considered distribution amounts. (T. TR., Vol. 3, pp. 589 and 590). Agent Kennedy also claimed that scales and sandwich baggies are used to package and weigh drugs for distribution and most street level dealers deal in cash. (T. TR., Vol. 3, pp. 590-591). Further, Agent Kennedy testified that drug dealers use firearms to protect their product, themselves, and their proceeds. (T. TR., Vol. 3, pp. 593-594).

After the government rested, Ms. Milner moved for judgment of acquittal. (T. TR., Vol. 3, p. 613-625). As to Count Three, Ms. Milner argued there was no evidence regarding an intent to distribute methamphetamine, and she told law enforcement that the narcotics and firearms were not hers. (T. TR., Vol. 3, p. 613-619). The district court denied the motion on that count. (T. TR., Vol. 3, p. 619).

As to Count Two, Ms. Milner argued that at the time she was supposedly out selling drugs, the firearms were at her house, and she did not have the firearms on her to assist her and so they could not be considered used in furtherance of drug sales. (T. TR., Vol. 3, pp. 619-622). The district court denied the motion on that count as well. (T. TR., Vol. 3, p. 622).

And as to Count One, Ms. Milner argued there was no evidence that she was in actual possession of the firearms; there was no DNA or fingerprint evidence linking her to those firearms; and just because she knew the guns were there, she did not have dominion and control over those firearms. (T. TR., Vol. 3, p. 622-625). The district court also denied the motion on that count. (T. TR., Vol. 3, p. 625).

During Ms. Milner's case-in-chief, she identified the two Hispanic men that were with her on August 16, 2023, as Chuy and Chiri. (T. TR., Vol. 3, p.

657). Ms. Milner also admitted that she is a recovering drug addict, and during that time, she was in the throes of her addiction, and her drug of choice was methamphetamine. (T. TR., Vol. 3, pp. 650-651).

As to Chuy and Chiri, Ms. Milner testified that she met them months before August 16, 2023, through her ex-boyfriend, Osmond. (T. TR., Vol. 3, p. 658). While Ms. Milner was hanging out with Osmond, Chuy and Chiri came over and gave him some methamphetamine. Because she was clean at the time, Ms. Milner immediately went home. (T. TR., Vol. 3, p. 658).

According to Ms. Milner, the next night, Osmond, Chuy, and Chiri showed up at her house, and she ended up getting high with them. (T. TR., Vol. 3, pp. 659 and 664). Osmond left, but Chuy and Chiri asked Ms. Milner if they could chill for a few days and she said sure. (T. TR., Vol. 3, pp. 664). Over the next few days, Ms. Milner was just getting high. (T. TR., Vol. 3, p. 677). After Chuy and Chiri had been at her house for about a week, Ms. Milner asked them to leave. Instead of leaving, one hit her upside her head with a gun. (T. TR., Vol. 3, p. 677). Ms. Milner tried to get them to leave about three or four times, but each time she was met with threats (threats to harm her, her family, and her property) or physical harm (slaps, punches, and kicks). (T. TR., Vol. 3, pp. 678, 681, and 682).

Ms. Milner also testified that during the time they occupied her house, Chuy and Chiri sold drugs out of her house. (T. TR., Vol. 3, p. 678). They also asked her to give them rides; feeling she had no option, Ms. Milner did so. (T. TR., Vol. 3, p. 682). Per their request, Ms. Milner gave them a ride on August 16, 2023.[4] (T. TR., Vol. 3, p. 683). When the police pulled her over, Ms. Milner immediately stopped the car and one of them handed her a bag of drugs. (T. TR., Vol. 3, p. 684). Ms. Milner tried to discretely hand the officer the drugs because she saw this as her opportunity to get Chuy and Chiri out of her house. (T. TR., Vol. 3, pp. 683-684 and 686-867).

Ms. Milner also confirmed that when officers asked her where the drugs had come from, she told them there were more drugs at the house and that they were not hers. (T. TR., Vol. 3, p. 687). Ms. Milner also attested that she told officers about Chuy and Chiri taking control of her house and bedroom; that she could not get them out; and that they had put a padlock on the door. (T. TR., Vol. 3, p. 687).

In addition, Ms. Milner explained that she was sleeping on the couch because Chuy and Chiri took over her bedroom. (T. TR., Vol. 3, p. 693). She

[4] Ms. Milner denied the claim that she received a phone call from a confidential informant to go sell drugs. (T. TR., Vol. 3, p. 718).

also knew the drugs and firearms were under the bed because she had been in the room and saw where they stored them. (T. TR., Vol. 3, pp. 692-694).

Furthermore, Ms. Milner was adamant that the firearms and narcotics found under the mattress were not hers; that she did not possess those firearms and narcotics; that the bag that she handed to Officer Nelson that contained 17 grams of methamphetamine was not hers; and that she was not selling drugs nor did she intend to sell any drugs. (T. TR., Vol. 3, pp. 695-696).

Following Ms. Milner's case-in-chief, she renewed her motion for judgment of acquittal, which the district court denied. (T. TR., Vol. 3, pp. 737-738).

During closing arguments, the government argued during rebuttal that Ms. Milner was going to say anything on the stand to be "found not guilty" and to "get out of trouble today." (T. TR., Vol. 3, p. 799). The government also avowed that Ms. Milner "absolutely lied on the stand" and that her "testimony wasn't credible on the stand." (T. TR., Vol. 3, pp. 800 and 806). The government also argued that the padlock was Ms. Milner's and that Chiri and Chuy would not need a padlock if they were beating her as she claimed. (T. TR., Vol. 3, p. 806). The government further claimed that

when Ms. Milner says in the video that she was going to get one registered in her name, she was talking about the guns found in her room.[5] (T. TR., Vol. 3, p. 801).

Ms. Milner objected to the government's characterization of the evidence, which the district court overruled. (T. TR., Vol. 3, pp. 807-809).

Following the reading of the jury instructions and closing arguments, the jury convicted Ms. Milner of all three counts.[6] (T. TR., Vol. 3, p. 825-826; R. Doc. 49) As to Count Three, the jury found that the offense involved at least 50 grams but less than 500 grams of a mixture or substance containing a detectible amount of methamphetamine.[7] (T. TR., Vol. 3, p. 826; R. Doc. 49, at p. 6).

---

[5] Ms. Milner clarified that when she said in the video that she was trying to get one registered in her name, she was stating "in general" and not referring to either of the guns found in the room. (T. TR., Vol. 3, pp. 722 and 723).

[6] The jury also found that Ms. Milner possessed both firearms as it relates to Counts One and Two. (T. TR., Vol. 3, pp. 825-826; R. Doc. 49, at pp. 1-4).

[7] The jury also found that Ms. Milner served more than 12 months' imprisonment for prior offenses for possession of methamphetamine and cocaine with purpose to deliver and that she was released from serving that term of imprisonment within 15 years of the commencement of the offense charged in Count Three. (T. TR., Vol. 3, p. 857; R. Doc. 51).

## III. Sentencing

On October 27, 2025, Ms. Milner appeared for sentencing before Judge Rudofsky. (R. Docs. 57 and 58). Based on a total offense level of 24 and a criminal history category of V, Ms. Milner's advisory guidelines range would have been 92 to 115 months' imprisonment. (S. TR., Vol. 1, pp. 13 and 16). However, because the statutory minimum for Count Three was 10 years' imprisonment, the district court calculated Ms. Milner's guidelines range as 120 months' imprisonment. (S. TR., Vol. 1, pp. 13, 16, and 17).

After hearing from the parties regarding what would be an appropriate sentence, the district court sentenced Ms. Milner to 92 months' imprisonment on Count One, 120 months' imprisonment on Count Three, to run concurrently to each other, and 60 months' imprisonment on Count Two, to run consecutive to Counts One and Three—for a total term of 180 months' imprisonment. (S. TR., Vol. 1, p. 27; R. Doc. 59, at p. 3). The district court also imposed a 3-year term of supervised release on Counts One and Two and an 8-year term of supervised release on Count Three—all to run concurrently to each other. (S. TR., Vol. 1, p. 18; R. Doc. 59, at p. 4).

Following the sentencing hearing, the judgment and commitment order was filed on October 28, 2025. (R. Doc. 59). This appeal follows.

## SUMMARY OF THE ARGUMENT

The government failed to prove beyond a reasonable doubt that Ms. Milner possessed the firearms and methamphetamine that were found underneath the mattress. While she knew those items were there, she did not have the power and intention to exercise dominion or control over those items. In addition, the government failed to prove beyond a reasonable doubt that Ms. Milner intended to distribute the methamphetamine that was handed to her during the traffic stop.

Given that the evidence is insufficient to prove beyond a reasonable doubt that Ms. Milner possessed the firearms, possessed methamphetamine with the intent to distribute, and possessed the firearms in furtherance of a drug trafficking crime, this Court should reverse her convictions on Counts One, Two, and Three.

Moreover, the district court reversibly erred in allowing Officer Hernandez to testify that a confidential source told him that Ms. Milner was selling narcotics. Admission of the statement violated Ms. Milner's Confrontation Clause rights; thus, this Court should reverse her convictions.

Furthermore, the government made several disparaging, egregious, and prejudicial statements during closing arguments that deprived Ms.

Milner of the right to a fair trial. This Court should therefore reverse Ms. Milner's convictions on this ground as well.

## ARGUMENT

**I. The district court should have granted Ms. Milner's motion for judgment of acquittal because the evidence is insufficient to sustain her convictions.**

### A. Standard of Review

"In reviewing the denial of a motion for a judgment of acquittal, [this Court] review[s] the sufficiency of the evidence *de novo*, evaluating the evidence in the light most favorable to the verdict and drawing all reasonable inferences in its favor." *United States v. Parker*, 871 F.3d 590, 600 (8th Cir. 2017).

"While reasonable inferences from the evidence weigh against the defendant, speculation does not." *Id.* at 603. *See also United States v. Aponte*, 619 F.3d 799, 804 (8th Cir. 2010) ("[T]he government is not entitled to inferences based on conjecture and speculation.").

And "[w]here the government's evidence is equally strong to infer innocence as to infer guilt, the verdict must be one of not guilty and the court has a duty to direct an acquittal." *United States v. Kelton*, 446 F.2d 669, 671 (8th Cir. 1971). *See also United States v. Foster*, No. 23-1372, 2024 WL 3064940, at *2 (8th Cir. June 20, 2024) (same).

## B. <u>Legal Analysis</u>

### 1. The evidence is insufficient to sustain Ms. Milner's 18 U.S.C. § 922(g)(1) conviction (Count One).

To support a conviction under 18 U.S.C. § 922(g)(1) for being a felon in possession of a firearm, the government had to prove beyond a reasonable doubt that: (1) prior to August 16, 2023, Ms. Milner "had been previously convicted of a crime punishable by a term of imprisonment exceeding one year;" (2) she "knew he belonged to the relevant category of persons barred from possessing a firearm"; (3) on August 16, 2023, she "knowingly possessed [] firearms"; and (4) "the firearm[s] [were] in or affecting interstate commerce." *See United States v. Burning Breast*, 8 F.4th 808, 812 (8th Cir. 2021).

Ms. Milner stipulated to the first, second, and fourth elements at trial. (T. TR., Vol. 1, pp. 328-329). However, Ms. Milner maintains that the evidence was insufficient to establish the third element—that she knowingly possessed the firearms that were discovered underneath the mattress.

This Court has held that "[a] conviction for being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1) may be based on constructive possession." *United States v. Ramos*, 852 F.3d 747, 754 (8th Cir. 2017). "Constructive possession requires both knowledge that the contraband is

present and dominion over the premises where the contraband is located." *Id.* *See also United States v. Ways*, 832 F.3d 887, 897 (8th Cir. 2016) ("[C]onstructive possession requires both knowledge that the contraband is present and dominion over the premises where the contraband is located.").

This Court has also recognized that in some cases "dominion over the premises can be sufficient by itself to prove constructive possession, because dominion may 'give rise to a strong inference of knowledge." *Ramos*, 852 F.3d at 754. However, "such an inference is not warranted under the facts of every case," and thus, "mere dominion is not always sufficient to establish constructive possession." *Id.* ("One context where mere dominion is insufficient to show that the defendant knowingly possessed a gun is in cases involving joint occupancy.").

For instance, "when there is joint occupancy of a [premises], dominion over the premises by itself is insufficient to establish constructive possession." *Id.*

In joint occupancy cases, "the government must provide additional evidence of a link between the contraband and the defendant." *Id.* at 754-55 ("Otherwise, father could be imprisoned for marijuana that his son has

hidden in the house, or a wife could be jailed for her husband's secret cache of illegal guns.").

In other words, "[t]he government must present some evidence supporting at least a plausible inference that the defendant had knowledge of and access to the . . . contraband." *United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998) (internal quotation marks omitted).

In *Ramos*, this Court reversed a felon in possession of a firearm conviction where the firearm at issue was found in an apartment that the defendant jointly occupied with another, Jasmyn Schmid. 852 F.3d at 755. There, the evidence presented at trial established the following: Law enforcement officers found a firearm under a mattress; officers also found men's and women's clothes in the closet in the bedroom where the firearm was found; Ramos tried to sell a different firearm to a co-conspirator; and Ramos admitted that he violated a condition of his parole involving "Weapons." *Id.*

In holding that this evidence was insufficient to support Ramos's conviction, the Court opined that "though the firearm likely belonged to either Ramos or Schmid or both, 'a conscientious mind would have to have

entertained a reasonable doubt′ about whether Ramos constructively possessed it." *Id.*

Here, Ms. Milner told law enforcement that the firearms were not hers. (T. TR., Vol. 2, pp. 559 and 561; T. TR., Vol. 3, pp. 694-695). Also, nobody ever saw Ms. Milner in possession of any firearms. (T. TR., Vol. 2, pp. 368, 451, and 561). Further, there is no DNA or fingerprint evidence linking Ms. Milner to the firearms. (T. TR., Vol. 2, pp. 470-471).

The only evidence linking Ms. Milner to the firearms is the fact that she knew they were in the bedroom underneath the mattress. Ms. Milner was aware of that fact because she saw Chuy and Chiri put the firearms and methamphetamine there. (T. TR., Vol. 3, pp. 692-694). But Ms. Milner did not have access or dominion or control over that bedroom during the time Chuy and Chiri occupied her home. Chuy and Chiri took control of Ms. Milner's house and bedroom, she was not allowed in the bedroom, and they put a padlock on the door to keep her out of that bedroom. (T. TR., Vol. 3, pp. 687, 693, and 720-721).

So, Ms. Milner did not knowingly have "both the power and intention . . . to exercise dominion or control" over those firearms and thus did not possess them. *See United States v. Dooley*, 580 F.3d 682, 686 (8th Cir. 2009).

Therefore, the evidence is insufficient to prove beyond a reasonable doubt that Ms. Milner knowingly possessed the firearms. This Court must therefore reverse Ms. Milner's conviction on Count One for being a felon in possession of firearms. *See Ramos*, 852 F.3d at 755 (reversing felon in possession of a firearm conviction where it was unclear from the evidence whether defendant, "though he lived at the apartment, exercised any control over the bedroom where the gun was found").

**2. The evidence is insufficient to sustain Ms. Milner's 21 U.S.C. § 841(a)(1) conviction (Count Three).**

To support a conviction under 21 U.S.C. § 841(a)(1) for possession with intent to distribute methamphetamine, the government had to prove beyond a reasonable doubt that Ms. Milner "(1) knowingly possessed the methamphetamine; and (2) had intent to distribute it." *Ramos*, 852 F.3d at 753.

Here, like with the firearms, Ms. Milner told law enforcement that the methamphetamine was not hers, and nobody ever saw her sell any methamphetamine. (T. TR., Vol. 2, pp. 368, 451, 559 and 561; T. TR., Vol. 3, pp. 694-695).

And while Ms. Milner was in actual possession of the 17 grams of methamphetamine that she handed to Officer Nelson, she was only in possession of that methamphetamine because Chuy or Chiri handed it to her when she was pulled over; she had no intention of distributing that methamphetamine. (T. TR., Vol. 3, pp. 684 and 695-696).

In addition, for the same reasons why the evidence is insufficient to prove beyond a reasonable doubt that that Ms. Milner knowingly possessed the firearms found underneath the mattress, the evidence is insufficient to prove beyond a reasonable doubt that she possessed the methamphetamine that was found there.[8] *See United States v. Brown*, 3 F.3d 673, 684 (3d Cir. 1993) ("At best, the evidence against Baltimore supports a finding that she resided at the Brown home and knew drugs were in the house. However, the evidence, viewed in the light most favorable to the government, cannot support a finding that Baltimore had dominion and control over those drugs."); *United States v. Soto*, 716 F.2d 989, 991 (2d Cir. 1983) (explaining that defendant's "mere presence at the apartment, even coupled with the

---

[8] Also, there is no DNA or fingerprint evidence linking Ms. Milner to the methamphetamine found underneath the mattress. (T. TR., Vol. 2, pp. 470-471).

knowledge that a crime was being committed there, is not sufficient to establish her guilt").

And because the evidence is insufficient to prove beyond a reasonable doubt that Ms. Milner possessed the methamphetamine, it follows that the evidence is insufficient to prove beyond a reasonable doubt that she possessed methamphetamine with intent to distribute it. Accordingly, this Court must reverse Ms. Milner's conviction on Count Three.

**3. The evidence is insufficient to sustain Ms. Milner's 18 U.S.C. § 924(c) conviction (Count Two).**

To support a conviction under 18 U.S.C. § 922(c) for possession of firearms in furtherance of a drug trafficking crime, the government had to prove beyond a reasonable doubt that: "(1) [Ms. Milner] possessed [] firearm[s] and (2) the possession had the effect of furthering, advancing or helping forward the drug crime." *United States v. Reeves*, 143 F.4th 999, 1008 (8th Cir. 2025) (internal citations omitted).

Here, for the reasons stated above, the government failed to prove beyond a reasonable doubt that Ms. Milner possessed the firearms and methamphetamine found underneath the mattress and that she intended to distribute any methamphetamine. Thus, the evidence is also insufficient to

prove beyond a reasonable doubt that she possessed firearms in furtherance of a drug trafficking crime. This Court therefore must reverse Ms. Milner's § 924(c)(1) conviction. *See United States v. Jenkins*, 90 F.3d 814, 821 (3d Cir. 1996) ("Because the government has not met its burden of proof on the predicate offense, Jenkins' conviction for using a firearm in connection with a drug offense must be also be reversed.").

Moreover, even if the government had proven beyond a reasonable doubt that Ms. Milner possessed the firearms underneath the mattress, the government failed to prove beyond a reasonable doubt that her supposed possession of those firearms had the "effect of furthering, advancing or helping forward the drug crime." *Reeves*, 143 F.4th at 1008.

Notably, at the time the government claims that Ms. Milner was out selling drugs, the firearms were at the house and not with her and thus not accessible to her. (T. TR., Vol. 2, pp. 337-338, 402, and 410; T. TR., Vol. 3, pp. 619-622). This, too, undermines a finding that Ms. Milner possessed the firearms in furtherance of a drug trafficking crime.

Accordingly, this Court must reverse Ms. Milner's conviction on Count Two.

**II. The district court reversibly erred in allowing Officer Hernandez to testify that a confidential informant claimed that Ms. Milner was selling narcotics.**

**A. Standard of Review**

Generally, this Court reviews preserved evidentiary challenges "under the differential abuse of discretion standard." *United States v. Arias*, 74 F.4th 544, 550 (8th Cir. 2023). But "if the challenge implicates a constitutional right," this Court's review is *de novo*." *Id*.

**B. Legal Analysis**

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. This is known as the Confrontation Clause. "The Confrontation Clause bars 'admission of testimonial [hearsay] statements of a witness who did not appear at trial unless [s]he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' " *United States v. Holmes*, 620 F.3d 836, 840 (8th Cir. 2010).

A testimonial statement is a statement made with a "primary purpose of creating an out-of-court substitute for trial testimony" or "establish[ing] or prov[ing] past events potentially relevant to a later criminal prosecution." *See Michigan v. Bryant*, 562 U.S. 344, 358 (2011); *Davis v. Washington*, 547 U.S.

813, 822 (2006). And hearsay is an out-of-court statement offered as evidence "to prove the truth of the matter asserted." *Holmes*, 620 F.3d at 841.

In *Holmes*, 620 F.3d at 840, the district court allowed a government's witness, Officer Robert Singh, to read from the search warrant affidavit concerning statements told to him by a CI. The defendant objected on the grounds that the evidence violated "his right to confront the witnesses against him—namely the CI—as secured by the Confrontation Clause of the Sixth Amendment." *Id.* The district court overruled the objection, finding that defense counsel "had opened the door to evidence of what information the officer had connecting [defendant] to the residence" when defense counsel questioned Officer Singh on cross-examination about "his knowledge of [defendant's] connection" to the residence (Anderson Avenue) subject to the search warrant. *Id.*

This Court disagreed—concluding that "neither [defendant] nor his attorney on his behalf made a clear and intentional waiver of [defendant's] rights to confrontation that would allow the full extent of the CI's statements read by Officer Singh." *Id.* at 843-44 ("While our court has recognized that otherwise inadmissible hearsay can be allowed to clarify or rebut evidence introduced by the defendant on the basis that the defendant opened the door

to the evidence, we are mindful that we are facing a constitutional challenge to the admission of the statements rather than a challenge based on evidentiary rules[.] We agree with the Tenth Circuit that *Crawford* did not change the rule that a defendant can waive his right to confront witnesses by opening the door 'to the admission of evidence otherwise barred by the Confrontation Clause.' But as previously noted, that waiver must be 'clear and intentional.'" (internal citations omitted)).

The Court noted that defendant's "counsel clearly did not intend to bring in the CI's statements during his cross-examination, and he objected to the Government's redirect on the basis that he had not opened that door." *Id.* at 844. The Court further concluded that, [t]o the extent he opened the door by asking questions of Officer Singh on cross-examination in an attempt to give the jury the impression that Officer Singh had no information tying [defendant] to the Anderson Avenue residence, he did not open the door so wide as to allow Officer Singh to recite the full extent of the statements from the CI implicating [defendant] in selling drugs and possessing firearms." *Id.* at 844.

The Court thus held that defendant "did not open the door to the long narrative read by Officer Singh, and the admission of the statements violated [defendant's] Confrontation Clause rights." *Id.*

Here, the government argued that Officer Hernandez's testimony regarding receiving a tip from a confidential source that Ms. Milner was selling narcotics was not hearsay because such testimony was being offered to explain the propriety of the investigation. (T. TR., Vol. 2, pp. 487-504).

Ms. Milner objected to the testimony because the propriety of the investigation was not being challenged, the reliability of the tipster could not be established, and admission of such testimony would violate the confrontation clause. (T. TR., Vol. 2, pp. 504-507).

Ms. Milner maintains that she did not challenge the propriety of the investigation and that her case is similar to *Holmes*;[9] thus, Officer Hernandez's testimony that he started investigating her after he received information from a source that she was selling narcotics[10] violated Ms. Milner's Confrontation Clause rights. *See Holmes*, 620 F.3d at 840.

---

[9] T. TR., Vol. 2, pp. 504-507.

[10] T. TR., Vol. 2, pp. 532-533.

This Court must therefore reverse Ms. Milner's convictions on Counts One, Two, and Three.

## III. The government made improper and prejudicial comments during closing arguments that deprived Ms. Milner of the right to a fair trial.

### A. Standard of Review

Allegations of prosecutorial misconduct present mixed questions of law and fact that this Court reviews de novo. *See United States v. True*, 179 F.3d 1087, 1089 (8th Cir. 1999). This Court will reverse a conviction "on the basis of prosecutorial misconduct only upon a showing that improper remarks, in light of any rulings or curative instructions by the district court and in light of the trial as a whole, could reasonably have affected the jury's verdict." *United States v. Holmes*, 413 F.3d 770, 774 (8th Cir. 2005).

### B. Legal Analysis

In deciding whether the government's improper remarks to the jury deprived the defendant of a fair trial, this Court examines "the cumulative effect of such misconduct, the strength of the properly admitted evidence of the defendant's guilt, and the curative actions taken by the trial court." *Id.* at 774-75 (internal quotations omitted).

"Prejudice sufficient to warrant reversal may result from the cumulative effect of repeated improper comments by the prosecutor." *United States v. Johnson*, 968 F.2d 768, 771 (8th Cir. 1992). But even "a single misstep on the part of the prosecutor may be so destructive of the right to a fair trial that reversal is mandated." *Id.* (internal quotations omitted).

Here, the government made several disparaging comments and mischaracterized the evidence during closing arguments. During rebuttal closing argument, the government argued that Ms. Milner was going to say anything on the stand to be "found not guilty" and to "get out of trouble today." (T. TR., Vol. 3, p. 799). The government also avowed that Ms. Milner "absolutely lied on the stand" and that her "testimony wasn't credible on the stand." (T. TR., Vol. 3, pp. 800 and 806). The government also mischaracterized the evidence when it claimed that when Ms. Milner says in the video that she was going to get one registered in her name, she was talking about the guns found in her room. (T. TR., Vol. 3, p. 801). The government further made an unsubstantiated claim that the padlock on the bedroom door was Ms. Milner's. (T. TR., Vol. 3, p. 806).

Thus, the government struck several foul blows in this case. *See Holmes*, 413 F.3d at 775 (cautioning that "prosecutors may not inject their own

testimony nor cast aspersions upon the defendant through offhand comments . . . ."); *id.* ("[T]he role of the prosecutor is not merely to pursue convictions, but to pursue justice—'the twofold aim of which is that guilt shall not escape or innocence suffer.' In pursuit of these dual goals, a government attorney may 'prosecute with earnestness and vigor . . . may strike hard blows . . . [but] is not at liberty to strike foul ones.' " (internal citations omitted)).

And given that evidence of guilt is not overwhelming here—indeed, such evidence is lacking—this Court must reverse Ms. Milner's convictions on Counts One, Two, and Three. *See United States v. Miller*, 621 F.3d 723, 729-33 (8th Cir. 2010)(reversing defendant's conviction where the government made improper comments during closing argument and evidence of guilt was not overwhelming); *Holmes*, 413 F.3d at 774-78 (same).

## CONCLUSION

For the foregoing reasons, Appellant Milner respectfully requests that this Court reverse her convictions.

Respectfully submitted,

LISA G. PETERS
FEDERAL DEFENDER

By: /s/ Sylvia Talley
Sylvia Talley, Bar No. 2014077
Research and Writing Specialist
The Victory Building
1401 West Capitol Avenue, Suite 490
Little Rock, AR 72201
(501) 324-6113
E-mail: sylvia_talley@fd.org

**CERTIFICATE OF SERVICE/COMPLIANCE**

I hereby certify that on March 6, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that the Appellee in the case is a registered CM/ECF user and that service will be accomplished by the CM/ECF system. I certify the brief has been scanned for viruses and is virus-free. I also certify that the name and version of the word processing software used to prepare this brief is Microsoft Word for Microsoft 365 MSO (Version 2506). I certify the full text of this brief was prepared in Book Antiqua, size 14, and that this brief contains 7693 total words.

I further certify that a true and correct copy of this Appellant's Brief has been mailed to the Appellant, Candace Milner, at her current address, and served upon the government by mail at the address below:

Candace Milner, 03924-511
FCI Tallahassee
Federal Correctional Institution
P.O. Box 5000
Tallahassee, FL 32314

Leslie Bright
Assistant U.S. Attorney
U.S. Attorney's Office
Eastern District of Arkansas
425 W. Capitol Avenue, Suite 500
Little Rock, AR 72201

/s/ Sylvia Talley
Sylvia Talley